A  UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| NATHAN F. PATTEE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Cause No. 1:21CV179-PPS/SLC |
| | ) | |
| KILOLO KIJAKAZI, Acting Commissioner | ) | |
| of the Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

After years of work at jobs including fine diamond die finisher, welding machine

tender, production assembler and laborer, Nathan Pattee applied to the Social Security

Administration for disability benefits and supplemental security income benefits,

claiming that he was unable to work as of September 6, 2018.  [AR 30, 16.][1]  His

applications were denied in the written decision of an Administrative Law Judge,

entered after a hearing at which Pattee appeared and testified.  [AR 40-90.]  The ALJ

found that Pattee has a number of severe impairments but concluded that those

impairments do not conclusively establish disability by meeting or medically equaling

the severity of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  [AR

20-23.]  Based on the ALJ's findings as to Pattee's residual functional capacity as well as

his age (then 45), education and work experience, the ALJ concluded that Pattee can

---

[1] The administrative record [AR] is found in the court record at docket entry 13, and consists of
2054 pages.  I will cite to its pages according to the Social Security Administration's Bates stamp numbers
rather than the court's Electronic Case Filing page number.

perform jobs that exist in significant numbers in the national economy, and that Pattee is not disabled.  [AR 30-31.]

Pattee asks me to reverse the ALJ's decision or remand the case for further administrative proceedings. My role is not to determine from scratch whether Pattee is disabled and entitled to benefits.  Instead, my review of the ALJ's findings is deferential, to determine whether the ALJ applied the correct legal standards and whether the decision is supported by substantial evidence.  *Shideler v. Astrue,* 688 F.3d 306, 310 (7th Cir. 2012);  *Castile v. Astrue*, 617 F.3d 923,926 (7th Cir. 2010); *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008).  The role of the courts is "extremely limited," and I am "not allowed to displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations."  *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).  In other words, I can't reweigh the evidence or substitute my judgment for that of the ALJ.  *Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015).  But these standards do not mean that I "will simply rubber-stamp the Commissioner's decision without a critical review of the evidence."  *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Although I cannot reweigh the evidence found in the administrative record, reversal is required where the ALJ failed to build an "accurate and logical bridge" between the evidence and his conclusions.  *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015);  *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014).

The ALJ identified a number of severe impairments that Mr. Pattee struggles with: coronary artery disease, chronic obstructive pulmonary disease, neurocardiogenic syncope, orthostatic hypotension, autonomic dysfunction, autonomic neuropathy, central sleep apnea, degenerative disc disease of the lumbar spine, history of polysubstance use, major depressive disorder, generalized anxiety disorder, intermittent explosive disorder, and cognitive dysfunction. [AR 19.] But in his testimony before the ALJ, Pattee identified the two conditions that contribute most to his inability to work. The first was the orthostatic hypotension, which results in lightheadedness and dizziness that require him multiple times each day to lie down and do exercises to increase his blood pressure. [AR 49-51, 53, 62.] The second was irritable bowel syndrome that requires frequent trips to the bathroom. [AR 53-55, 62.]

### ALJ's Evaluation of Medical Evidence of Neurocardiogenic Syncope

Pattee's first argument is that the ALJ erred in her evaluation of medical evidence concerning Pattee's autonomic dysfunction and neurocardiogenic syncope. [DE 17 at 9.] These conditions are responsible for Pattee's drops in blood pressure and associated symptoms of dizziness and lightheadedness. The ALJ's decision contains a detailed review of Pattee's history of cardiac and pulmonary testing and treatment in an effort to address these symptoms. [AR at 27-29.] Pattee complains that the ALJ considered critical medical evidence, namely the May 2020 tilt table testing, without the

benefit of medical expert analysis, and so relied impermissibly on her own lay interpretation of the evidence.  [DE 17 at 9.]

The ALJ's decision acknowledged that "[a] May 15, 2020 tilt table test was positive for neurocardiogenic syncope (41F)."  [AR 27, citing AR 1943.]  She further observed that, despite the positive test, "[a]t a cardiology appointment the next week, the claimant reported he felt much better with medications (42F)" and "[h]is provider indicated no medication changes were necessary" in that Pattee "reported no orthostatic lightheadedness, no recurrent syncope, no chest pain, and no stroke symptoms."  [AR 27-28, citing AR 1966.] In other words, contrary to the claim that there was no expert medical interpretation of the positive tilt test, the ALJ specifically relied on Pattee's treating cardiologist, Dr. William Wilson, to analyze its significance in the context of his then-current symptoms and treatment.

Pattee claims that the ALJ "cherry-picked evidence to characterize Mr. Pattee's symptoms as resolved despite later evidence demonstrating the symptoms were ongoing and persistent."  [DE 17 at 9, citing AR 27-28.]  Pattee cites the report of Nurse Practitioner Victoria Fox on August 4, 2020 assessing him with ongoing neurocardiogenic syncope, shortness of breath and orthostatic hypotension.  [DE 17 at 9, citing AR 1981-82.]  The ALJ did not overlook this medical record, but noted that Fox prescribed a heart monitor and increased the prescription that Pattee reported had helped his orthostatic hypotension.  [AR 1981.] The ALJ acknowledged portions of the

medical record such as the positive tilt table test and Pattee's many medical visits reporting orthostatic hypotension symptoms, but also the several physicians who could not identify a cardiac or pulmonary etiology for the symptoms.  [AR 27-28.]  I am not persuaded that the ALJ engaged in the sort of lopsided evaluation of the medical record as occurred in the case cited by Pattee, *Reinaas v. Saul*, 953 F.3d 461, 467 (7th Cir. 2020) (error for an ALJ to ignore an entire line of evidence contrary to her ruling).

Pattee also points to his hearing testimony about ongoing difficulties with lightheadedness, and (without a specific citation) evidence submitted to the Appeals Council.  [DE 17 at 9.]  Of course, the ALJ could not have taken into account evidence submitted only after she rendered her decision. And as for the ALJ's analysis of the hearing testimony, I will address that below since Pattee has raised it as a distinct issue.

## Listing 4.05

As the ALJ explained, step three of the sequential process for evaluating disability claims involves determining whether the claimant's impairments "meet or medically equal the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1" of the Social Security regulations.  [AR at 18.]  These "Listings" address many categories of medical conditions and specify the criteria for impairments that are presumptively disabling.  If both a Listing and a duration requirement are met, the claimant is disabled.  20 C.F.R. §404.1520(d).  Pattee argues that the ALJ's Listing analysis was deficient.

In Pattee's case, the ALJ concluded that Pattee does not meet any "cardiovascular listing" or "neurological listing." [AR 20.] The ALJ also considered in detail a number of other Listings including Listing 3.02 for chronic respiratory disorders; Listing 1.04 for disorders of the spine; or Listings 12.02, 12.04, 12.06 or 12.08 for mental impairments. [AR 20-23.]  Pattee argues that the ALJ erred because she "failed to consider the most pertinent listing, Listing 4.05 (Recurrent arrhythmias)."  [DE 17 at 10.]  Listing 4.05 is one of twelve Listings in the category "4.00 Cardiovascular System."  So when the ALJ said Pattee did not meet *any* cardiovascular listing (a conclusion Pattee overlooks in his brief), the ALJ expressed her conclusion that he did not meet the requirements of Listing 4.05, contrary to Pattee's contention that she "failed to consider" the Listing.

The ALJ explained her conclusion with this sentence:  "The file does not contain test results that meet the relevant criteria or indicate that the claimant has persistent symptoms that have resulted in very serious limitations in initiating, sustaining, or completing activities of daily living or in three or more separate episodes requiring acute extended physician intervention."  [AR 20.]  What exactly is Pattee's contention that requires remand?  Pattee cannot argue both that the ALJ failed to consider the listing (he says this twice, DE 17 at 10, 11), *and* that the ALJ's discussion or analysis of the listing was insufficient (because the latter would acknowledge that the ALJ had considered the Listing).

Listing 4.05 applies to recurrent arrhythmias that are:

not related to reversible causes, such as electrolyte abnormalities or digitalis glycoside or antiarrhythmic drug toxicity, resulting in uncontrolled..., recurrent...episodes of cardiac syncope or near syncope..., despite prescribed treatment....and documented by resting or ambulatory (Holter) electrocardiography, or by other appropriate medically acceptable testing, coincident with the occurrence of syncope or near syncope[.]

For purposes of Listing 4.05, "syncope is a loss of consciousness or a faint."  Listing §4.00F3b.  "Near syncope" is defined as "a period of altered consciousness," and the regulations expressly provide that "[i]t is not merely a feeling of light-headedness, momentary weakness or dizziness."  *Id*.  "Recurrent" means clinical records showing that the findings occurred at least three times within a 12-month period.  Listing §4.00A3c.

Pattee contends that there was medical evidence in the administrative record that supported application of Listing 4.05.  [DE 17 at 10-11.]  The report of the May 15, 2020 tilt table test evidences one instance of syncope documented by medical testing, as Pattee lost consciousness during the test.  [AR 1945.]  But Pattee does not cite a second such episode of syncope or near syncope documented by electrocardiography or other medical testing, much less two more within 12 months.  The ALJ's explanation, although likely boilerplate, encompasses this failure of the medical evidence to support application of Listing 4.05.  The Commissioner rightly points out that Pattee bears the burden to show that his impairments met or medically equaled all of the criteria of a Listing.  *See, e.g., McHenry v. Berryhill*, 911 F.3d 866, 872 (7th Cir. 2018).

Giving Pattee's brief a generous interpretation, he may also be contending that there is some error in the ALJ's consideration of whether his combined impairments equaled Listing 4.05 or some other Listing. [DE 17 at 11.] Pattee does not identify supportive evidence in detail and the argument is underdeveloped. In any event, Pattee fails to demonstrate that the ALJ's conclusions should be second-guessed. As of March 27, 2017, the applicable Social Security Ruling expressly provides that the ALJ need not be more detailed in articulating her finding of non-equivalence.

> If an adjudicator at the hearings or AC level believes that the evidence already received in the record does not reasonably support a finding that the individual's impairment(s) medically equals a listed impairment, the adjudicator is *not required to articulate specific evidence* supporting his or her finding that the individual's impairment(s) does not medically equal a listed impairment. Generally, a statement that the individual's impairment(s) does not medically equal a listed impairment constitutes sufficient articulation for this finding. An adjudicator's articulation of the reason(s) why the individual is or is not disabled at a later step in the sequential evaluation process will provide rationale that is sufficient for a subsequent reviewer or court to determine the basis for the finding about medical equivalence at step 3.

Social Security Ruling 17-2p, 2017 WL 3928306, at *4 (emphasis added).

The Seventh Circuit has recognized that under the March 2017 regulation the ALJ does not have to separately discuss equivalence: "an ALJ need not articulate specific evidence supporting a finding that an impairment does not medically equal a listed impairment; a simple statement of non-equivalence will suffice." *Deloney v. Saul*, 840 Fed.Appx. 1, 4 (7th Cir. 2020). Furthermore, "[a]n adjudicator's articulation of the reason(s) why the individual is or is not disabled at a later step in the sequential

8

evaluation process will provide rationale that is sufficient for a subsequent reviewer or court to determine the basis for the finding about medical equivalence at step 3." Social Security Ruling (SSR) 17-2P, 2017 WL 3928306, at *4 (effective March 27, 2017).

Similarly, the requirements for an ALJ to consider expert medical opinion on the question of equivalence are not stringent: "If an adjudicator at the hearings or AC level believes that the evidence does not reasonably support a finding that the individual's impairment(s) medically equals a listed impairment, we do not require the adjudicator to obtain ME evidence or medical support staff input prior to making a step 3 finding that the individual's impairment(s) does not medically equal a listed impairment." *Id.* *See also Shawn S. v. Saul*, No. 1:19CV4046, 2021 WL 363557, at *4 (S.D. Ind. Feb. 3, 2021) ("Under SSR 17-2p, SSA no longer 'require[s] the adjudicator to obtain [Medical Expert] evidence or medical support staff input prior to making a step 3 finding that the individual's impairment(s) does not medically equal a listed impairment'" (quoting SSR 17-2p, 2017 WL 3928306, at *4)); *Zieroth v. Saul*, No. 1:19CV181, 2020 WL 3490235, at *3 (N.D. Ind. May 29, 2020) ("while ALJs must rely on experts to interpret medical evidence, they are not necessarily required to obtain a medical opinion specifically as to whether a claimant meets or equals a listing") (citing SSR 17-2p, 2017 WL 3928306, *3-4 (Mar. 27, 2017) (explaining that ALJs determine whether a listing is met or equaled, and "may ask for and consider evidence from medical experts").

In sum, the claimant bears the burden of establishing that his impairments meet or equal the criteria of a listed impairment. *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir.

2006).  Pattee does not demonstrate any error by the ALJ in analyzing the Listings potentially relevant to his claim of disability.

### State Agency Non-Examining Consultants

Pattee argues that the ALJ erred in accepting the assessment of non-examining state agency medical consultants Joshua Eskonen, D.O. and M. Ruiz, M.D. that Pattee was capable of performing work at the medium exertional level.  [DE 17 at 11-12.]  More specifically, Pattee contends that their opinion was rendered in September 2019, prior to the tilt table testing in May 2020 and "the spinal imaging," which Pattee does not cite or otherwise identify until 3 pages later.  [DE 17 at 12, 15.]  By "spinal imaging," Pattee refers to MRI reports from January 2021. [AR 115, 117, 119.].  This medical information was not yet available at the time of the ALJ's decision in October 2020, and cannot form the basis for any error in her analysis.  Below I will address Pattee's more pertinent contention about the Appeals Council's handling of medical evidence offered after the ALJ's decision.

As to the tilt table result, I have already observed that the ALJ had expert medical interpretation of its significance in the form of Pattee's subsequent visit to cardiologist Dr. William Wilson.  Although Dr. Wilson noted that the test showed neurocardiogenic syncope, he observed that subsequently Pattee's "symptoms are much improved," "he is not having any orthostatic lightheadedness now," and "has had no recurrent syncope."  [AR 1966.]  In addition, the ALJ's decision took into account

Pattee's severe impairments of neurocardiogenic syncope and orthostatic hypotension, and Pattee fails to explain how the tilt table test would have made any difference to the conclusions of Dr. Eskonen and Dr. Ruiz, or ultimately to the ALJ who was aware of the tilt table test result and cardiologist Dr. Wilson's consideration of it.  In any event, the ALJ found Dr. Eskonen's findings only "partially persuasive" and concluded that Pattee had greater postural, environmental and mental limitations than Eskonen found.  [AR 29.]

### Appeals Council's Rejection of New Medical Evidence

Pattee contends that the Appeals Council committed reversible error in its treatment of medical evidence generated after the ALJ's decision on October 27, 2020. [DE 17 at 13.] According to C.F.R. §404.970(a)(5), the Appeals Council considers additional evidence "that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision."  Pattee argues that the Appeals Council "summarily dismissed" certain medical evidence from November, December and January "based solely on the date" of those records, and that this violated §404.970(a)(5).  [DE 17 at 13.]  But that is an unfair characterization of the Appeals Council's decision.

The Appeals Council expressed a two-part conclusion that "this additional evidence does not relate to the period at issue" and "[t]herefore, it does not affect the

decision about whether [Pattee was] disabled beginning on or before October 27, 2020."

[AR 2.]  Pattee's argument assumes that the Appeals Council's treatment of the post-

hearing evidence was based solely on dates when the Council's own decision indicates

otherwise, instead indicating two conclusions against the evidence – that it doesn't

relate to the relevant period in time and that it wouldn't impact the Commissioner's

conclusion that Pattee was not disabled.  Obviously a conclusion that evidence does not

relate to the period in question is not necessarily based solely on the date of the

evidence, as Pattee suggests.

I will nonetheless consider whether the Appeals Court erred.  Which

determinations by the Appeals Council concerning newly submitted evidence are

subject to court review is a matter in some flux at present.  *See Xiong v. Kijakazi*, Case

No. 20-CV-1493, 2022 WL 124522, at *4 (E.D.Wisc. Jan 13, 2022) (helpful review of the

state of the law).  But let's assume that the Appeals Council's rejection of the evidence

was on a basis that permits a court to review it for legal error, I find none.  Pattee

highlights three particular post-decision treatment records.

First, Pattee visited the cardiology clinic on November 3, 2020, where he reported

he was still experiencing "some lightheadedness," which was "mostly triggered by heat

or standing for a prolonged period of time."  [AR 111.]   The nurse practitioner who saw

Pattee that day responded by increasing Pattee's dose of Florinef (a drug used to treat

orthostatic syncope) to once a day.  [AR 110.]  Other lifestyle changes (including the use

of compression garments, increasing both hydration and sodium intake) were also recommended.  [AR 111.]  Pattee was directed to "contact the office next week with a clinical update at which time we may need to make further adjustments."  [*Id.*]  The record does not reflect Pattee's follow-up report on the efficacy of the new dosage and other recommendations.

Pattee recognizes that reversal on this basis requires a reasonable probability that the Commissioner would have reached a different conclusion had the evidence been considered.  [DE 17 at 16.]  *See McFadden v. Berryhill*, 721 F.3d Appx. 501, 506 (7th Cir. 2018); *Stepp v. Colvin*, 795 F.3d 711, 725 (7th Cir. 2015). At the time of her decision, the ALJ was well aware that Pattee suffered from neurocardiogenic syncope and orthostatic hypotension, both of which she identified as severe impairments.  [AR 19.]  The ALJ also observed that Pattee's symptoms varied with treatment.  [AR 27, 28.]  Pattee fails to show, and I am not persuaded, that consideration of this one additional medical visit involving continued care for his condition, so similar to the information already analyzed by the ALJ, would have made any difference to the disability decision. *See Mehnert v. Kijakazi*, Case  No. 21-C-0012, 2022 WL 476063, at *11 (E.D.Wisc.  Feb. 16, 2022); *Teresa F. v. Saul*, No. 1:18-cv-01967, 2019 WL 2949910, at *9   (S.D.Ind.  July 9, 2019) (affirming Commissioner where newly submitted evidence was not substantially different than evidence considered by the ALJ).

The second post-decision evidence Pattee highlights is even less pertinent.  His office visit with Nurse Practitioner Victoria Fox on November 17, 2020 focused on what Fox described as "all new sx" or symptoms, involving sudden surges in Pattee's blood pressure, as opposed to the sudden drops in blood pressure associated with the conditions the ALJ assessed in the disability determination.  [AR 106.]  The Appeals Council did not err in concluding that this evidence did not relate to the period before the ALJ's decision.

Finally, Pattee highlights his consultation on December 28, 2020 with Dr. Stephanie Falatko "regarding constant back pain and episodic neck pain associated with headaches."  [DE 17 at 14.]  The clinical notes from that session classify Pattee as a "new patient/consult" regarding neurosurgery.  [AR 121.]  Back and neck pain and headaches were not the basis for Pattee's claim of disability before the ALJ.  Instead, the focus of his claim was on the lightheadedness associated with syncope and orthostatic hypotension, and irritable bowel syndrome.  [AR 53, 62.]  Pattee described the pain he was complaining about to Dr. Falatko as having started "in September."  [AR 121.]  This record, and the MRIs of the lumbar and thoracic spine that Dr. Falatko ordered, do not relate to Pattee's disability claim for the period on or before the date of the ALJ's decision, but to a new and different condition.  Pattee fails to show that the Appeals Council committed legal error in rejecting reconsideration of the ALJ's decision based on this later-obtained medical evidence.

14

## Evaluation of Subjective Reports

Next Pattee contends that the ALJ erred in evaluating the subjective reports given by him and his wife.  As Pattee acknowledges, this kind of claim faces a high hurdle:  a credibility determination of this type is not overturned unless it is "patently wrong," so long as the ALJ "gives specific reasons supported by the record." *Grotts v. Kijakazi*, 27 F.4th 1273, 1279 (7th Cir. 2022).

In her decision, the ALJ reviews Pattee's hearing testimony about his symptoms, abilities and activities, and then uses boilerplate language:

> After careful consideration of the evidence, the undersigned finds that claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

[AR 24-25.]  This familiar conclusion is backed up with further explanation.

 A number of specific instances of Pattee's failure to "fully participate in his treatment" are cited in support of the ALJ's refusal to fully accept Pattee's subjective claims.  [AR 25-26.]  Courts have repeatedly observed that a claimant's failure to cooperate fully in diagnosis and treatment may undercut his credibility as to symptoms. *Goble v. Astrue*, 385 Fed.Appx. 588, 591-92 (7th Cir. 2010); *Dawn M. v. Saul*, Civil No. 2:20cv249, 2021 WL 1884916, *7 (N.D.Ind. May 11, 2021); *Dawson v. Colvin*, No. 11 C 6671, 2014 WL 1392974, *10 (N.D.Ill.  Apr. 10, 2014) (collecting cases).  The ALJ also cites a number of treatment providers who have expressed the view that, where a physical

basis for Pattee's complaints could not be confirmed, depression may play a role in Pattee's health problems, but that view has repeatedly been dismissed by Pattee and his wife, which further diminishes their credibility concerning Pattee's medical conditions. [AR 25-26.]  The ALJ also sets out the observations of a number of treaters that Pattee's wife is a negative influence on Pattee and on his treatment, as she is anxious and opinionated about Pattee's medical condition although without regard to objective medical findings.  [AR 26-27.]  The ALJ reasonably supports the ultimate conclusion that Pattee's wife's third party report is only "minimally persuasive," given that the "overall record does not support her vast and varied allegations."  [AR 30.]

I have already found that Pattee's earlier contentions about the ALJ erring in evaluating medical evidence and opinion are without merit, so Pattee's related argument now that the ALJ erred in applying those conclusions to her evaluation of the subjective reports is also unavailing.

The ALJ's treatment of the subjective statements of Pattee and his wife meet the applicable standard of providing specific reasons supported by the record, and is not shown to be "patently wrong."  The regulations instruct ALJs to consider a number of factors, but "[a]n ALJ need not discuss every detail in the record as it relates to every factor."  *Grotts*, 27 F.4th at 1278.  *See also Gedatus v. Saul*, 994 F.3d 893, 903 (7th Cir. 2021).  "And the presence of contradictory evidence and arguments does not mean the ALJ's determination is not supported by substantial evidence."  *Gedatus*, 994 F.3d at 903.

16

Pattee does not demonstrate patent error in the ALJ's evaluation of the subjective assertions in support of disability.

### Completeness of RFC Hypothetical to the Vocational Expert

The ALJ determined Pattee's residual functional capacity or RFC,  which is defined as "the most you can still do despite your limitations."  C.F.R. §416.945(a)(1). After determining a claimant's RFC, an ALJ asks a vocational expert whether a person with those limitations can be gainfully employed.  The RFC analysis "'must include all of a claimant's limitations supported by the medical record,'" but *only* limitations that are supported by the medical record.  *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022), quoting *Deborah M. v. Saul*, 994 F.3d 785, 791 (7th Cir. 2021).  The pertinent portions of the RFC as found in the ALJ's decision are as follows:

> [T]he claimant can understand, remember and carry out simple instructions and tasks, he can make judgments on simple work related decisions, he can respond appropriately to occasional interactions with coworkers, supervisors and the general public, he can respond appropriately to usual work situations, and he can deal with routine changes in a routine work setting.

[AR 23-24.]  Pattee argues that the ALJ did not include all of his limitations in the RFC analysis and in the hypothetical posed to the vocational expert.  [DE 17 at 21.]  Pattee repeats his argument challenging the ALJ's reliance on the state agency medical consultants and his contention that the ALJ had no expert medical opinion to assess Pattee's later medical evidence of neurocardiogenic syncope.  As before, when rehashed in the RFC context, these arguments still do not carry the day.

More to the point, Pattee next contends that the ALJ "failed to properly assess Mr. Pattee's concentration, persistence, or pace and social interaction limitation stemming from a combination of his physical and mental impairments and failed to create a logical bridge between the limitations she assigned and the weight she afforded to the medical opinion evidence." [DE 17 at 22.] Pattee refers specifically to the opinions of two state agency consultants, and he questions the ALJ's handling of their expert conclusions.

Leslie Predina, Ph.D. performed a mental consultative exam and found that Pattee was likely to "have some problems being able to concentrate and persist on his job responsibilities" and to "struggle to get along with his supervisors and coworkers due to his mental health issues." [AR 1287.] The ALJ found Dr. Predina's opinions "mostly persuasive" but indicated that she ultimately found that Pattee had "greater mental limitations" than Dr. Predina found. [AR 29, 30.]

Maura Clark, Ph.D., was the non-examining state agency psychological consultant on reconsideration. In what is referred to as the "checkbox" portion of her evaluation, Dr. Clark assessed Pattee as having moderate limitations in concentration, persistence and pace, as well as in interacting with others [AR 147], but ultimately gave this mental RFC conclusion:

> The evidence suggests that claimant can understand, remember, and carry out detailed, but not complex tasks. The claimant can relate on a superficial and ongoing basis with co-workers and supervisors. The claimant can attend to tasks for a sufficient period to complete tasks. The

18

claimant can manage the stresses involved with detailed work-related tasks.

[AR 151.]  Similarly, the ALJ's decision states that she found "mostly persuasive" the determination of Dr. Clark on reconsideration, but that unspecified "greater mental limitations" were appropriate.  [AR 29.]

Pattee contends that the ALJ's decision fails to account for all the limitations found by Drs. Predina and Clark, or to explain how the RFC the ALJ assessed (and provided to the vocational expert) included even more significant limitations than those observed by Drs. Predina and Clark.  The Commissioner points out that the ALJ restricted the RFC to work requiring only "simple instructions and tasks" and "simple work related decisions," whereas Dr. Predina thought Pattee might "have the cognitive ability to perform comparable jobs to that which he has performed in the past," which would include skilled positions.  [DE 22 at 18; AR 13.]  The ALJ agreed with the vocational expert that Pattee was not capable of performing any of his past relevant work.  [AR 30.]  In this way the ALJ drew reasonable conclusions about Pattee's capacity for complex work, mindful of Dr. Predina's findings on Pattee's limited concentration and persistence but applying a greater cognitive limitation than the consultant did.  When the consultants themselves have not expressed a pace-specific limitation, Pattee fails to demonstrate that any medically documented limitation concerning pace was not accounted for with the limitations the ALJ did impose.

19

*Matthews v. Kijakazi*, Cause no. 2:21-CV-193 RLM-JPK, 2022 WL 3025887, *3 (N.D.Ind. Aug.1, 2022).

Limitations to simple tasks and decision-making, requiring only simple judgments, have been found to adequately account for a claimant's moderate limitations in concentration, persistence, and pace. *Pytlewski v.* Saul, 791 Fed.Appx. 611, 616 (7th Cir. 2019); Dudley *v. Berryhill*, 773 Fed.Appx. 838, 842 (7th Cir. 2019). Dr. Predina did not use qualitative assessment terminology such as "moderate" or "mild" limitations. She merely expressed in her narrative summary that Pattee's "ability to sustain his concentration and persistence appeared to be impaired" and that he "would likely have some problems being able to concentrate and persist on his job responsibilities." [AR 1287.] She nonetheless concluded, albeit rather indefinitely, that Pattee "may have" the cognitive ability to perform the sorts of jobs he had held in the past. [AR 1287.] In her RFC, the ALJ found that Pattee's functional capacity was more limited than that.

The comparison between the ALJ's findings and Dr. Clark's is clear enough. Whereas Dr. Clark found Pattee could perform "*detailed*, but not complex tasks," the ALJ found Pattee limited to "*simple* instructions and tasks" involving "judgments on *simple* work related decisions." [AR 151, 23 (emphasis added).] Whereas Dr. Clark found that Pattee was able to "relate on a superficial and *ongoing basis* with co-workers and supervisors," the ALJ found that Pattee is capable only of "*occasional* interactions

with coworkers, supervisors and the general public." [AR 151, 23 (emphasis added).]
This is a more restrictive limitation than the one Dr. Clark opined but generally
consistent with Dr. Clark's more specific findings.

Dr. Clark completed a standard Disability Determination Explanation. In
addition to the categorical findings of "moderate" impairment in interaction with others
and in concentration, persistence and maintaining pace,[2] Dr. Clark also offered slightly
more detailed findings. [AR 147, 150-51.] Pertinent to concentration and persistence,
Dr. Clark found that Pattee's ability to carry out very short and simple instructions ,
and even detailed instructions, was "not significantly limited." [AR 150.] She also
found that Pattee's ability to maintain attention and concentration for extended periods
was "moderately limited," but that he is not significantly limited in his ability to
perform activities within a schedule, to maintain an ordinary routine without special
supervision, and to work with or around others without being distracted by them. [AR
150-151.] Together these findings reasonably supported Dr. Clark's Mental Residual
Functional Capacity, but the ALJ found in several respects that Pattee was slightly more
limited.

Specific findings by Dr. Clark on Pattee's social interaction ability include that he
is "not significantly limited" in accepting instructions and responding appropriately to

---

[2] It is worth remembering that: "A 'moderate limitation' is defined by regulation to mean that functioning in that area is 'fair.' 20 C.F.R. Pt. 404, Subpt. P, App. 1. As the Commissioner points out, 'fair' in ordinary usage does not mean 'bad' or 'inadequate.'" *Pavlicek*, 994 F.3d at 783.

criticism from supervisors, in getting along with coworkers or peers, and in maintaining socially appropriate behavior.  [AR 151.]  So in conclusion Dr. Clark assessed Pattee as being able "to relate on a superficial and ongoing basis with co-worker and supervisors."  [AR 151.]  The ALJ's limitation of Pattee to "occasional interactions with coworkers, supervisors and the general public" is more limiting than what Dr. Clark proposed, because in the context of interpersonal encounters, "occasional" has repeatedly been found to signify minimal interaction with others.  *See Leon A. v. Kijakazi*, No. 20-cv-939,  2022 WL 3226822, at *8 (N.D.Ill.  Aug. 10, 2022) ("courts have repeatedly found that a state agency psychiatrist's opinion that a claimant should have 'minimal' interactions with coworkers and supervisors is adequately encompassed by an RFC limiting the claimant to 'occasional' interactions") (collecting cases).  *See also Reynolds*, 25 F.4th at 474-75; *Hofstad v. Kijakazi*, Case No. 21-CV-352-SCD,  2022 WL 3057243, at *6 (E.D.Wisc.  Aug. 3, 2022) (claimant fails to explain how RFC's limitation to "occasional interaction with coworkers and supervisors" fails to account for doctor's finding of "some difficulty" responding appropriately to others in the workplace).

Where an ALJ relies on the narrative explanations offered by physicians but fails to adequately account for other limitations identified in the check-box sections of the standardized Mental Residual Functional Capacity form, without any explanation why those other limitations are not credible, remand may be appropriate.  *DeCamp v. Berryhill*, 916 F.3d 671, 676 (7th Cir. 2019).  *See also Long v. Berryhill*, No. 3:19-CV-00155-

JD, 2020 WL 2079294, at *4 (N.D.Ind.  Apr. 30, 2020).  On the other hand, an ALJ can

reasonably "rely on a doctor's narrative RFC, rather than the checkboxes, where that

narrative adequately encapsulates and translates those worksheet observations."  *Varga

v. Colvin*, 794 F.3d 809, 816 (7th Cir. 2015).  *See also Pavlicek v. Saul*, 994 F.3d 777, 783 (7th

Cir. 2021) (an ALJ may rely on a consultant's narrative assessment if it expresses

limitations consistent with the consultant's "checkbox" ratings; *Angel R. v. Kijakazi*, No.

1:21-cv-02331-TAB-JRS, 2022 WL 2663003, *5 ("[M]oderate limitations were

encompassed in the narrative portion of the report, and the ALJ was not required to

separately discuss or weigh the 'checkbox' limitations").  "Although checklist

observations cannot be ignored, they are 'perhaps less useful to an ALJ than a doctor's

narrative summary and do not outweigh the narrative opinions."  *Urbanek v. Sault*, 796

Fed.Appx. 910, 915 (7th Cir. 2019), quoting *Varga*, 794 F.3d at 816.

Pattee fails to demonstrate that the ALJ erred in making the RFC determination.

An ALJ is not required to explain in detail her justification for accepting or rejecting

each piece of evidence offered in support of a disability claim.  *Rice v. Barnhart*, 384 F.3d

363, 371 (7th Cir. 2004).  Here the ALJ supported her reasoning by reliance on objective

evidence supporting her conclusions and reasonably weighed medical opinions in the

record to produce an RFC that included all of Pattee's demonstrated limitations.  In

several respects, the ALJ found *greater* limitations than were assessed by experts.  Pattee

points to no physician recommendation that his RFC contain limits greater than those

the ALJ set.  *Reynolds*, 25 F.4th at 474.  Substantial evidence supported the RFC determination.

### Conclusion

The ALJ sufficiently articulated her findings and conclusions to permit meaningful judicial review, so a remand is not warranted for lack of explanation. Beyond that, my role is not to determine whether the plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.  *Hawkins v. Saul*, 2019 WL 6492491, at *1 (7th Cir. Dec. 3, 2019); *Eichstadt v. Astrue*, 534 F.3d 663, 665-666 (7th Cir. 2008). Applying these standards, I will affirm the denial of disability benefits.  In reviewing the ALJ's decision, I "may not decide facts anew or make independent credibility determinations, and must affirm the ALJ's decision even if reasonable minds could differ about the ultimate disability finding."  *Brown*, 845 F.3d at 251.  After consideration of each of Pattee's assertions of error, I conclude that substantial evidence supports the ALJ's determination that Pattee is not disabled, and the ALJ's decision "build[s] an accurate and logical bridge between the evidence and the result."  *Beardsley*, 758 F.3d at 837.

**ACCORDINGLY:**

The final decision of the Commissioner of Social Security denying plaintiff

Nathan F. Pattee's application for disability benefits and supplemental security income

benefits is AFFIRMED.

The Clerk shall enter judgment in favor of the defendant Commissioner and

against plaintiff Pattee.

**SO ORDERED**.

ENTERED: September 1, 2022.

/s/ Philip P. Simon
**UNITED STATES DISTRICT JUDGE**